*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SAMMAR T. FARAJ and KEIRA P. CHARTIER,

        Plaintiffs-Appellants,

v

RONALD GILES,

        Defendant-Appellee,

and

HISTORIC COLONIAL REALTY CO, LLC, HYDE PARK COOPERATIVE, MAGAR MANAGEMENT COMPANY, and SAMUEL J. MAGAR,

        Defendants.

UNPUBLISHED
June 13, 2024

No. 366854
Wayne Circuit Court
LC No. 22-002619-CZ

Before: MURRAY, P.J., and RIORDAN and D. H. SAWYER*, JJ.

PER CURIAM.

Plaintiffs appeal, by leave granted,[1] the trial court order granting defendant, Ronald Giles', motion for summary disposition. Because the trial court properly found that the "as is" clause in the parties' purchase agreement barred plaintiffs' claim of innocent misrepresentation, but erroneously found that the clause also barred plaintiffs' common-law fraud and fraud in the inducement claims, we affirm in part, reverse in part, and remand for further proceedings.

Defendant Hyde Park Cooperative is a nonprofit corporation that owns residential housing buildings on Hyde Parke Drive in Detroit. Persons wanting to live in the residential housing

---

[1] *Faraj v Giles*, unpublished order of the Court of Appeals, entered October 10, 2023 (Docket No. 366854).

---

\* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

buildings purchase an "equity share" in Hyde Park Cooperative (the Co-op) which, once they also sign an occupancy agreement, gives them the right to occupy a particular unit in one of the buildings. Purchasers also becomes shareholders in and members of the Co-op and are governed by and subject to the Co-op's bylaws and rules. The instant matter concerns the townhouse at 2088 Hyde Park Drive (Unit 2088), a two-story townhouse with a basement.

Defendant Ronald Giles (Giles) purchased the equity share for Unit 2088 in January 2014 for $15,000. The Unit had previously suffered severe damage because of flooding from burst water pipes and required extensive renovation. Giles thus bought the property "as is." Giles made significant renovations on Unit 2088, including removing a load bearing wall, rebuilding floors, replacing and expanding a bathroom and the kitchen, and repairing certain electrical, heating, ventilation, and air conditioning (HVAC) components.

In January 2019, Giles listed his equity share in Unit 2088 for sale with defendant Historic Colonial Realty Co, LLC[2] as the listing agency. Plaintiffs entered into an "Offer to Purchase Equity" agreement with Giles on or about January 10, 2019 for $310,000. The Offer to Purchase contained an inspection contingency provision and an "as is" clause:

18. This offer is contingent upon Buyers obtaining a satisfactory inspection within 10 days of acceptance by Seller; it is agreed and understood by all parties, that said offer is subject to Hyde Park Cooperative Board approval.

19. Seller insures that all monthly assessments and special assessments until the time of the closing have been paid. House to be broom swept at close. Said property to be sold in an "AS-IS" condition.

Also on or about January 10, 2019, plaintiffs received a Seller's Disclosure Statement filled out by Giles where he stated he has lived in Unit 2088 from February 2015 to the present date and that he was not aware of any: roof leaks; structural modifications, alterations, or repairs made without the necessary permits or licensed contractors; settling, flooding, drainage, or structural problems, or; major damage to the property from floods.

Plaintiffs had an inspection performed on Unit 2088 and thereafter the parties signed an addendum to the Offer to Purchase agreement, removing the inspection contingency in consideration of lowering the purchase price by $2,500 because of minor repairs. Plaintiffs ultimately purchased Giles' equity share in Unit 2088 on March 5, 2019 for $307,500.00 and assumed occupancy on March 20, 2019.

Shortly after moving into Unit 2088, plaintiffs discovered water leaking from the first-floor living room ceiling. Over the next several months, other defects cropped up, including water pooling in the second-floor bathroom ceiling, the ceiling having cracked open and begun leaking in both the second-floor bathroom and second-floor office, water leaks in every window, nail pops

---

[2] This defendant is not a party to the appeal. Neither is Magar Management Company, the company with whom Hyde Park Cooperative contracted to provide management services from at least 2011 through 2020, defendant Samuel J. Magar, or Hyde Park Cooperative.

in nearly every room, and the sound of water dripping in the walls. According to plaintiffs, Giles failed to obtain the required permits for the renovations, some of the renovations were not up to code, and much of the workmanship for the renovations was shoddy. There also appeared to be evidence of water damage that occurred between the time of Giles' renovation and the sale to plaintiffs, which appeared to have been covered up. Thus, on March 7, 2022, plaintiffs filed an 11-count complaint against defendants. Relative to Giles, the claims are: (I) fraud (Giles made false assertions in connection with the sale and in the Seller's Disclosure Statement); (II) fraud in the inducement (the misrepresentations made by Giles were made to induce plaintiffs to purchase Giles' equity shares in Unit 2088); (III) negligence per se (Giles violated several provisions of the Building Officials and Codes Administrators building code and other ordinances); (V) innocent misrepresentation (Giles made representations to plaintiffs in connection with the sale and plaintiffs relied on them).

Giles moved for summary disposition, citing MCR 2.116(C)(8) and (10). Giles asserted that plaintiffs failed to claim fraud with specificity and did not provide any documentation to support their claims. Giles also pointed out that plaintiffs bought the property "as is" and inspected the property, expressing satisfaction with the condition of Unit 2088 before purchasing the equity share. Giles further asserted that he hired a contractor to perform the repairs and, according to the contractor, he was licensed and all work was done in compliance with, and approved by, the City of Detroit and the bylaws of the Co-op. Finally, Giles asserted there were no leaks in Unit 2088 during his ownership, nor did any leaks exist when it was sold to plaintiffs, and he never actively concealed any defects in the property. Plaintiffs responded that they made very specific statements concerning their claims of fraud in their complaint and Giles addressed none of them. Plaintiffs further responded that Giles has not supported his motion, having only submitted a self-serving affidavit containing hearsay statements and two unsigned contractor estimates that contain no indication of licensure or compliance with codes or bylaws. Plaintiffs provided documentary evidence to refute the claims made by Giles in his motion. The trial court granted Giles' motion on March 20, 2023 "for reasons stated in his motion and brief" and later denied plaintiffs' motion for reconsideration. This appeal followed.

We review a trial court's decision regarding a motion for summary disposition de novo. *Bernardoni v City of Saginaw*, 499 Mich 470, 472; 886 NW2d 109 (2016). Here, the trial court did not state which court rule it relied upon in granting summary disposition to Giles. However, the trial court relied primarily upon the "as-is" clause contained in the purchase agreement, which was not attached to plaintiffs' complaint or otherwise part of the pleadings. We will thus treat the matter as though the trial court granted Giles' motion under MCR 2.116(C)(10). See *Gibson v Neelis*, 227 Mich App 187, 190; 575 NW2d 313 (1997).

A motion for summary disposition made under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Bernardoni*, 499 Mich at 472. The Court considers all affidavits, pleadings, depositions, admissions, and other substantively evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. "When the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id*. at 473 (citation omitted).

Plaintiffs contend that trial court erred in ruling that the "as is" clause in the purchase agreement barred their fraud claims.[3]  We agree, in part.

The primary goal of contract interpretation is to enforce the parties' intent.  *Burkhardt v Bailey*, 260 Mich App 636, 656; 680 NW2d 453 (2004).  When the language of the contract is clear and unambiguous, we look at the actual words used and must give effect to every word, phrase, and clause in a contract to avoid an interpretation that would render any part of the contract surplusage or nugatory.  *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

As a general matter, evidence from outside the four corners of a purchase agreement is limited by the parol-evidence rule.  See *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 492; 579 NW2d 411 (1998).  However, the parol-evidence rule does "not preclude evidence that a statement within the purchase agreement, or within the seller's disclosure statement that was referred to in the purchase agreement, was fraudulent."  *Coosard v Tarrant*, 342 Mich App 620, 635; 995 NW2d 877 (2022).

"As is" clauses in purchase agreements allocate the risk of loss arising from conditions unknown to the parties.  *Lorenzo v Noel*, 206 Mich App 682, 687; 522 NW2d 724 (1994). "They do not, however, transfer the risk of loss where 'a seller makes fraudulent representations before a purchaser signs a binding agreement.' "  *Id*., quoting *Clemens v Lesnek*, 200 Mich App 456, 460; 505 NW2d 283 (1993).

In similar vein, "[t]he common-law rule with respect to real estate transactions is *caveat emptor*."  *Roberts v Saffell*, 280 Mich App 397, 402; 760 NW2d 715 (2008).  At common law, then, a buyer of real property assumes all responsibility for the condition of the property once the seller surrenders his title, possession, and control of the property to the buyer.  *Id*.  Michigan does recognize, however, several theories of fraud as exceptions to the common-law rule of *caveat emptor* in real estate transactions: (1) traditional common-law fraud, (2) innocent misrepresentation, and (3) silent fraud.  *Id*. at 403.  In this case, plaintiffs asserted the first two theories of fraud as well as fraud in the inducement.  Therefore, the "as is" clause in the purchase agreement does not necessarily preclude plaintiffs from showing that Giles committed fraud in the Seller's Disclosure Statement.

Traditional common-law fraud consists of the following elements:

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered

---

[3] Plaintiffs do not challenge the trial court ruling with respect to their negligence per se claim against Giles.

damage. [*M&D, Inc v WB McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998).]

In addition, the plaintiff's reliance must be reasonable. *Coosard*, 342 Mich App at 633.

In Count I of their complaint, plaintiffs alleged that Giles engaged in common-law fraud as follows:

> 40. In connection with the sale of his equity share, Giles made material misrepresentations of fact to Plaintiffs, including, without limitation, asserting in writing in the Seller's Disclosure Statement (Exhibit B) that no structural modifications, alterations, or repairs had been made without necessary permits or licensed contractors, that there were no roof leaks, and that there was no evidence of water intrusion.

> 41. Giles knew such representations were false at the time made.

> 42. Such representations were made with the intent that Plaintiff rely upon them. Plaintiffs did rely upon such representations to their detriment.

> 43. As a direct and proximate result of said misrepresentations, Plaintiffs have suffered and/or will suffer damages, including, without limitation, purchasing the equity share for far more than its actual value, impairment of the use and enjoyment of their home, diminution in the desirability, marketability, and value of their equity share, the incurrence of costs to investigate, repair and/ or replace the inadequacies, defects, deficiencies, and deviations, as well as the incidental and consequential damage caused thereby; mental anguish and emotional distress.

The Seller Disclosure Act specifically addresses the liability of a seller for statements contained in the Seller's Disclosure Statement:

> (1) The transferor or his or her agent is not liable for any error, inaccuracy, or omission in any information delivered pursuant to this act if the error, inaccuracy, or omission was not within the personal knowledge of the transferor, or was based entirely on information provided by public agencies or provided by other persons specified in subsection (3), and ordinary care was exercised in transmitting the information. It is not a violation of this act if the transferor fails to disclose information that could be obtained only through inspection or observation of inaccessible portions of real estate or could be discovered only by a person with expertise in a science or trade beyond the knowledge of the transferor. [MCL 565.955]

But, "[t]he specification of items for disclosure in this act does not limit or abridge any obligation for disclosure created by any other provision of law regarding fraud, misrepresentation, or deceit in transfer transactions." MCL 565.961. In short,

> it is evident that the Legislature intended to allow for seller liability in a civil action alleging fraud or violation of the act brought by a purchaser on the basis of

misrepresentations or omissions in a disclosure statement, but with some limitations. Liability is precluded for errors, inaccuracies, or omissions in a seller disclosure statement that existed when the statement was delivered, where the seller lacked personal knowledge, and would not have had personal knowledge by the exercise of ordinary care, of any error, inaccuracy, or omission and thus proceeds in good faith to deliver the disclosure statement to the buyer. [*Bergen v Baker*, 264 Mich App 376, 385; 691 NW2d 770 (2004).]

The Seller's Disclosure Statement filled out and signed by Giles asks a number of questions Giles was charged with answering. Relevant to the instant matter, the Seller's Disclosure Statement asks under "Property conditions, improvements & additional information:" "Roof leaks?" to which Giles checked the box for "no." Giles wrote "no" in response to the question of whether there were any known problems with the plumbing system, and checked the box "no" for the questions of whether there were any structural modifications, alterations, or repairs made without the necessary permits or licensed contractors, and to whether there was any settling, flooding, or drainage problems.

There was an option to check "unknown," if the information was unknown to Giles, and the instructions for filling out the Seller's Disclosure Statement direct, "[i]f you do not know the facts, check UNKNOWN." Giles opted to check the boxes for "no," indicating that he had the requisite knowledge to make an assertion one way or another. Indeed, Giles also attached an affidavit to his motion for summary disposition, in which he swore all of the information listed in the Seller's Disclosure Statement was the extent of the knowledge he had regarding the property. Giles also swore that the contractor he hired "told him" he was licensed and that all work performed was done in compliance with the City of Detroit and the bylaws of the Co-op. Giles also affirmatively swore that "[t]he contractor pulled all proper permits to complete the renovations," that the defects claimed by plaintiffs "do not exist," and that he never concealed any defects on the property as alleged in plaintiffs' complaint.

Not only are the pertinent statements in Giles' affidavit self-serving inadmissible hearsay statements, see MRE 801(c) and MRE 802, rendering defendant's motion for summary disposition largely unsupported,[4] Giles contradicted those statements at his deposition, taken on March 14, 2023, before the trial court entered the order granting summary disposition in his favor. The deposition transcript was provided to the trial court with plaintiffs' motion for reconsideration.

Giles testified at his deposition that when he took possession of Unit 2088 in 2014 it had a lot of damage. The furnace did not work and the Unit did not even have floors; you could stand in the basement and look up to the top floor. Giles testified that he began repairs as soon as they were approved by the Co-op Board of Directors.

Giles testified that among the work he had performed on Unit 2088, he had: a support wall removed to make a bedroom bigger; a beam put in the ceiling where the wall was removed; floors

---

[4] "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)." MCR 2.116(G)(3)(b).

-6-

reconstructed; a floating staircase from the basement to the second-floor installed; electrical plugs installed in the basement; the furnace and water heater replaced; the guest bathroom expanded; the kitchen countertops and backsplash replaced; plumbing work done; and framing and drywall done. Giles testified that he performed some of the work himself, including replacing the kitchen cabinets, installing all of the hardwood floors on all three levels, and replacing some of the drywall in the upstairs master bedroom and in the basement. Giles testified that his real-estate agent told him to paint the Unit white prior to the sale, as it had gray walls, which he did, doing some of the painting himself.

When asked about permits for the work he had done on the Unit, Giles testified that if there were required permits, he assumed the contractors would have obtained them. When asked if he believed the necessary permits were obtained for the renovations he had performed, Giles answered "I don't know if they were obtained or not. I know I didn't do it." Giles testified that he stopped by Unit 2088 while the renovations were being performed, but cannot recall seeing any permits posted on the property during renovation, or seeing any permits, ever. Giles testified that no one from the Co-op Board or defendant Magar Management Co., ever did any inspection of the renovations, and to his knowledge, no one from the City of Detroit ever inspected the renovations. Giles testified that he did not receive a certificate of occupancy, certificate of completion, or certificate of acceptance from the City of Detroit and does not know if any contractor he used received any certificate of any kind.

Notably, Giles testified that he was on the Co-op Board for the year before he moved, during which time he was involved in decisions regarding applications to modify Co-op units. Thus, he was aware that applications for a major modification, such as a structural one, required the names and licenses of the contractors. Giles testified that he knows the main contractor he used, Quality Renovation, Inc., was licensed because it provided a license to him, which he, in turn, provided to the Co-op Board. Giles testified that before he began any work on Unit 2088, he had to submit a list of everything he wanted to do to, the contractors he wanted to use and their licenses, and estimates of the costs, to defendant Samuel J. Magar (Magar). Giles then had a brief meeting with the Co-op Board where they went through the list of everything he wanted done and the people he was going to have perform the work, and Magar called him a day or two later and told him everything had been approved.

Giles testified that the work took several months to complete and after the renovations were done, he never had any problems with the renovations, structural issues, drywall cracks, or with water leaking thereafter. Giles also testified, however, that during the time he occupied the Unit (which was after the major renovations were done) the Co-op performed some repairs, such as having a basement drain snaked and repairing a roof leak over the garage. Giles also later recalled that he had issues with water leaking from the windows while he was living there and the Co-op paid for them all to be replaced. He further later recalled that at one point the upstairs bedroom ceiling leaked and he contacted defendant Magar, who had it repaired.

Giles deposition testimony, then, contradicts some of answers on the Seller's Disclosure Statement. While Giles checked the boxes for "no" roof leaks, structural modifications, alterations, or repairs made without necessary permits or licensed contractors, and whether there was settling, flooding, drainage, structural, or flooding problems, his deposition testimony reveals that at best he should have checked "unknown." Indeed, given his testimony, he should have

checked "yes" for roof leaks but did not do so. Giles' deposition testimony and the Seller's Disclosure Statement is also called into question by documentary evidence submitted by plaintiffs in response to his motion for summary disposition.

Giles provided the trial court with two estimates of work for Unit 2088 prepared by Quality Renovation, Inc., his primary contractor, and Artistic Iron Works, Inc, the contractor that installed the floating staircase, neither of which contain any licensing information. Plaintiffs provided the trial court with a Michigan Licensing and Regulatory Affairs (LARA) search result showing no license could be found for either company.

Giles affidavit, deposition testimony, and the Sellers Disclosure Statement were also called into question by a letter provided to the trial court sent to plaintiff Faraj from the Co-op dated October 1, 2021. The letter stated, in pertinent part:

> Thank you for allowing Hyde Park Cooperative to preform (sic) an inspection of your home to get a better understanding of the health and safety concerns you brought to our attention in your home as a result of modifications that were preformed (sic) by the former owner. As you are aware from our previous conversations, these modifications were done without the knowledge or approval of the Board of Directors of Hyde Park. The modifications and alterations to the home were extensive and there is no evidence of any approved permits. As a result, many items need to be brought up to code in an expeditious manner. After careful review, we have determined that the items highlighted in yellow in the attached inspection are a health and safety concern stemming directly from the modifications preformed (sic) by the former owner. Regretfully, I must inform you that you are responsible for addressing these items.

The company hired by the Co-op to perform the inspection, Green Home Construction, LLC, found a litany of problems with Unit 2088, beginning with the fact that the Unit "had extensive renovations within the last few years" but "no inspection approval stickers were found on any of the usual places" and "[a] record check on the City of Detroit website was inconclusive. This level of renovations would require permits for building/structural, electrical, plumbing and HVAC." Green Home Construction indicated it did not inspect the roof or exterior, and that it did not open up the circuit breaker panel, electrical boxes, or pipe access points to do a thorough inspection, but its report lists significant and major defects. The defects noted include: unapproved gas valve type in the kitchen; refrigerator not on a dedicated circuit as required; dishwasher not on a dedicated circuit and ground fault interrupter protected as required; loose electrical outlets throughout the Unit; two areas of living room ceiling drywall having been removed because of water leaks from master bath above it; dryer gas line not properly fastened to the wall; overflow from water heater not tightened to fitting and too close to floor; condensation pipe from furnace not properly fastened; circuit panel replaced but no approval sticker present; basement windows show signs of water infiltration; problems with the floating staircase including unfinished drywall and gaps on the sides of the landing area, that it "may not be properly supported" and "if a structural report was not filed and approved by the City of Detroit, a structural engineer should be consulted;" and the shower pan in the upstairs master bath failed or was never placed, causing water damage in the living room below. The report also notes that where the ceilings were open and not drywalled, it was apparent that required firestopping was not performed as required.

Plaintiffs also provided the trial court with two additional reports noting defects in Unit 2088. First is a report from Structural Associates Inc. (SAI) dated April 22, 2022, wherein SAI indicated the purpose of visiting Unit 2088 on April 18, 2022 was "to review the existing structure for any structural deficiencies due to alterations of the original structure." SAI noted cracks in the first-floor ceiling drywall, cracks in the second-floor bathroom ceiling, and inadequate beams used in the first-floor ceiling. SAI recommended that the noted inadequacies be remedied and that the ceiling at the roof be opened up to verify the existing beam to ensure that it is adequate.

Second, plaintiffs provided the trial court with a letter from B. H. Clarke Engineering, LLC (B. H. Clarke) dated December 10, 2022. In the letter, B. H. Clarke noted many key issues including cracks in the ceiling directly under the beams where load bearing walls were removed; floor and ceiling joists incorrectly connected to beams; ceiling cracks in other areas; movement of the hardwood floors at the bottom of the stair flight leading to the second-floor; the connection of the stairway to the main floor wooden beam appears to be causing rotation of the beam; nail and screw pops common throughout the home; poor quality drywall finishing throughout; water damage to the subfloor and ceiling directly below the master bath shower; damaged and cracked tile grout lines in the master bath; and water staining and ceiling cracks in the second-floor hall bathroom. B. H. Clarke saw no evidence that building permits were obtained for the renovation work and stated that the work "absolutely required licensed building trade contractors, each of whom should have obtained permits for their work." B. H. Clarke further stated that:

> Building, mechanical, plumbing, and electrical inspections were also required. Upon completion of the renovation, the primary licensed building contractor should have applied for a "Certificate of Acceptance" or "Certificate of Occupancy" and addressed any issues necessary for a certificate to be issued. None of these steps appear to have been satisfied relative to the previous renovation work.
>
> ***
>
> Furthermore, since the renovation work involved structural changes to the building, design drawings prepared and sealed by or for a licensed architect or engineer would need to be submitted to the Building Department for review and approval. Those drawings are typically required to be submitted with the permit application(s).

The letter further provides that "[f]ailure of the prior owner to involved licensed contractors and design professionals and to assure that required permits and inspections were obtained and performed is a major factor in the presence and severity of the hidden construction defects that have surfaced or been uncovered since [plaintiffs] purchased this unit."

Giles relies heavily on the fact that plaintiffs had Unit 2088 inspected before signing the final agreement to rebut their claims of fraud. In denying plaintiffs' motion for reconsideration the trial court cited to the "as is" clause in the purchase agreement and also opined, "[p]laintiffs in this matter had an inspection performed upon the property prior to the date of closing. They expressed satisfaction with the inspection and decided to move forward with the sale. If they had hesitations regarding the remodeling, including who performed the work done on the property and whether certificates of compliance were issued, it should have been addressed prior to the sale."

It is true that an "as is" clause may transfer the risk of loss to a buyer where an alleged defect should have reasonably been discovered upon inspection, but was not. *Lorenzo*, 206 Mich App at 687. And, in general, "[t]here is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant." *Coosard*, 342 Mich App 637, quoting *Schuler v American Motors Sales Corp*, 39 Mich App 276, 280; 197 NW2d 493 (1972). But,

> [t]hat general rule has an important caveat: parties do not have an independent duty to investigate and corroborate representations unless they were presented with some information or affirmative indication that further investigation was necessary. Therefore, an "as is" clause will not protect a seller against a claim for fraud merely because the buyer could have discovered the truth.[] Instead, it must have been reasonable to expect the buyer to discover a defect upon inspection, and it must also be reasonable for the buyer to conduct the inspection in the first place. [*Coosard*, 342 Mich App at 637-638 (internal citations and punctuation omitted).]

Plaintiffs asserted that they hired an inspector, whose inspection was visual only and was not capable of discovering latent defects. That their inspector did not see immediate defects lends credence to plaintiffs' claim that defects were concealed by Giles, given that serious problems began to occur almost immediately and an inspection conducted by a company hired by the Co-op mere months after plaintiffs moved in revealed a multitude of issues. Moreover, reports prepared by firms inspecting Unit 2088 after plaintiffs moved in all indicate issues with items such as beams installed in the ceiling where a support wall was removed, which would not be readily observable on visual inspection, as well as issues with water leakage from the upstairs master bath and the roof. And again, Giles had a prior problem with a roof leak in the master bedroom and in the garage which he testified about at deposition, but did not disclose in the Seller's Disclosure Statement.

Giles also relies on *Farm Bureau Mutual Ins Co v Wood*, 165 Mich App 9; 418 NW2d 408 (1987), to argue that the "as is" clause should act as a complete bar to plaintiffs' claims. However, not only is that case not binding, because of its age, (see MCR 7.215(J)(1)), but also "the principal issue in *Wood* was not whether the defendants, as property owners, owed a duty to disclose the [claimed defects of a] defective artesian well and the flood damage, but concerned whether the defendants fraudulently concealed the latent defects." *Clemens*, 200 Mich App at 460. Plaintiffs here have pleaded common-law fraud, fraud in the inducement, and innocent misrepresentation, not fraudulent concealment.[5] More importantly, this Court, in *Wood*, determined that there was sufficient evidence to create a jury question as to whether the defendant was aware of the claimed defects given that the parties each testified differently concerning what the other said, was told, and knew. "Clearly . . . the court exceeded its authority by choosing to disbelieve the [one party's] testimony in favor of [another party]. It is well settled that the credibility of witnesses is a matter within the province of the jury." *Wood*, 165 Mich App at 17-18.

In this matter, the evidence provided to the trial court, when viewed in a light most favorable to plaintiffs, sufficiently established at least a question of fact concerning whether: Giles

---

[5] Also called silent fraud. See *Saffell*, 280 Mich App at 403-404.

made false material representations concerning the permits for the major restoration/renovation work, the licensing of contractors hired to perform such work, and knowledge of roof leaks and water intrusion; with the knowledge that the representations were false or recklessly made without knowledge of its truth as a positive assertion; whether Giles made the representations with the intention that plaintiffs would act upon them; whether plaintiffs acted in reliance upon them; and whether plaintiffs suffered damage. *M&D, Inc*, 231 Mich App at 27. Having established a question of fact concerning whether Giles engaged in common-law fraud, which serves as an exception to the transfer of risk to a property purchaser under an as-is clause, *Lorenzo*, 206 Mich App at 687, and as an exception to the common-law rule of *caveat emptor* in real estate transactions, *Saffell*, 280 Mich App at 403, the trial court erred in granting summary disposition to Giles on plaintiffs' claim of common-law fraud.

In Count II of their complaint, plaintiffs alleged fraud in the inducement. The elements for fraud in the inducement are the same as those for common-law fraud. Compare *Custom Data Sol, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243; 733 NW2d 102 (2006), with *M&D, Inc*, 231 Mich App at 27. The key difference between the two claims is that, while common-law fraud relates to misrepresentations of past or existing fact, fraud in the inducement "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Custom Data Sols*, 274 Mich App at 242-243.

Giles again disputes that he made any misrepresentations and that plaintiffs' claim is barred by the "as is" clause in the purchase agreement. Having already determined that plaintiffs established a question of fact on the elements of common-law fraud, however, we find they have also established a question of fact on the elements of fraud in the inducement. Plaintiffs primarily asserted that Giles made false statements in the Sellers Disclosure Statement with the intention that plaintiffs rely on the statements and they did so. Plaintiffs alleged that the misrepresentations made in the Sellers Disclosure Statement induced them to enter into the purchase agreement and, but for Giles' misrepresentations in the Sellers Disclosure Statement concerning defects that were not readily apparent on walk-through inspection, they would not have entered into the purchase agreement.

Like with common-law fraud, an "as is" provision in a contract does not allocate the risk of loss to the purchaser where fraud in the inducement is alleged. See *Clemens,* 200 Mich App at 460–461. Fraud in the inducement addresses a situation where one party claims it was tricked into contracting. It arises from pre-contractual conduct. *Huron Tool & Eng Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 371; 532 NW2d 541 (1995). "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely . . . but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id*. at 372-373.

Plaintiffs' signing of the agreement resulted in them purchasing an equity share in Unit 2088 and living in that unit for only a short time before discovering defects (such as insufficient beam support in the ceiling and water leaking from a poorly installed/nonexistent shower pan) that were not apparent on a walk-through inspection. The allegations of fraud are firmly and inextricably tied to the purchase agreement and sufficient evidence has been presented which, when viewed in the light most favorable to plaintiffs, present questions of material fact concerning

whether Giles fraudulently induced plaintiffs to enter into the purchase agreement. The trial court therefore erred in granting summary disposition in favor of Giles on the claim of fraud in the inducement.

Finally, plaintiffs alleged in Count V of their complaint that Giles is liable for innocent misrepresentation. Innocent misrepresentation is shown "if a party detrimentally relies upon a false representation in such a manner that the injury suffered by that party inures to the benefit of the party who made the representation." *M&D, Inc*, 231 Mich App at 27. A plaintiff asserting an innocent misrepresentation claim need not prove that the defendant *intended* to deceive the plaintiff into relying on a false or misleading representation. *Saffell*, 280 Mich App at 405 (emphasis added). "Indeed, under the theory of innocent misrepresentation, false statements the claimant relied on are actionable irrespective of whether the person making them acted in good faith in making them . . . ." *Id*. (internal quotation marks and citation omitted).

As previously stated, innocent misrepresentation is one kind of fraud in Michigan and one of the few exceptions to the rule of *caveat emptor* in real estate sales. *Saffell*, 280 Mich App at 403. But,

> innocent misrepresentation is premised upon the seller having no knowledge of the falsity of a representation, and "as is" clauses are fundamentally intended to allocate the risk of unknown losses. If a claim of innocent misrepresentation could avoid application of an "as is" clause, then "as is" clauses would essentially become universally invalid. Therefore, we conclude that an "as is" clause does preclude a claim of innocent misrepresentation. Although the trial court did not grant summary disposition on this basis, summary disposition pursuant to MCR 2.116(C)(8) would be appropriate as to plaintiffs' innocent-misrepresentation claim. [*Coosard*, 342 Mich App at 637.]

The same holds true here. Thus, plaintiffs' claim of innocent misrepresentation is barred by the "as is" clause in the parties' purchase agreement.

In sum, the trial court properly granted summary disposition in Giles' favor on the claim of innocent misrepresentation, but erred in granting summary disposition in Giles' favor on plaintiffs' claims of common-law fraud and fraud in the inducement.

Affirmed in part, reversed in part. This matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ David H. Sawyer